# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

Docket No. 22-16274

---

TONYA HALE

Plaintiff – Appellant

vs.

NV PROPERTY 1, LLC, DBA The Cosmopolitan of Las Vegas, a Nevada Limited

Liability Company; THE COSMOPOLITAN OF LAS VEGAS; RICHARD

SHERMAN, an individual

Defendants – Appellees

---

On Appeal From an Order of the
United States District Court
For the District of Nevada

---

## APPELLEE THE COSMOPOLITAN'S ANSWERING BRIEF

---

LISA A. MCCLANE
FISHER & PHILLIPS, LLP
300 South Fourth Street, Suite 1500
Las Vegas, Nevada 89101
Telephone: (702) 252-3131

Attorney for Appellee

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellees, NV PROPERTY 1, LLC, DBA The Cosmopolitan of Las Vegas, a Nevada Limited Liability Company; THE COSMOPOLITAN OF LAS VEGAS (hereinafter "The Cosmopolitan").  MGM Resorts International operates The Cosmopolitan.   No entity or person owns more than 10% of its corporate stock.

Dated this 20th day of July, 2023.

FISHER & PHILLIPS, LLP


_____/s/ Lisa A. McCane_____
Lisa A. McClane, Esq.
*Attorneys for Appellee*

FP 47779876.3

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES  …………………………………………… iv

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 3

ISSUES PRESENTED ...................................................................................... 3

STATEMENT OF THE CASE ........................................................................... 4

    A.   The Parties ....................................................................................... 5

    B.   Hale's Interactions With Sherman ................................................... 6

        1.    No Problematic Contacts With Sherman Before
              January 2018 ......................................................................... 6

        2.    The January 10, 2018 Incident ............................................... 6

    C.   How Hale Expected The Cosmopolitan To Handle Sherman .............. 10

    D.   Bentley's Response To Sherman's January 10, 2018 Actions .............. 11

    E.   The Cosmopolitan Security Also Responded ....................................... 13

    F.   Hale Did Not Complain About Gender Based Conduct Until
        Several Days After Sherman Had Already Left The Casino ................ 15

    G.   Hale's Brief Encounter With Sherman On February 6, 2018 ............... 15

    H.   Hale's February 7, 2018 Email To Kellie Gorman ............................... 16

    I.   Hale's Game Assignments ................................................................. 17

    J.   Administration Of Hale's FMLA Usage .............................................. 19

SUMMARY OF THE ARGUMENT ..................................................................... 21

    A.   Hale's IIED was Properly Dismissed .................................................. 21

    B.   Hale's Retaliation Was Properly Dismissed ....................................... 22

    C.   Hale's Hostile Work Environment Claim Was Properly    Dismissed .. 23

STANDARD OF REVIEW ................................................................................. 24

    A.   Dismissal For Failure To State A Claim .............................................. 24

    B.   Leave To Amend ............................................................................... 24

FP 47779876.3

C.      Summary Judgment ...............................................................25

ARGUMENT ......................................................................................27

A.      Hale Waived Her IIED Claim Against The Cosmopolitan ................27

        1.      Negligence Theory Of Liability Raised For First Time
                On Appeal ......................................................................27

        2.      Failure To Identify Intentional Conduct By The Cosmopolitan
                That Would Be Considered Extreme And Outrageous
                Eviscerates Hale's IIED Claim .......................................27

        3.      Hale's IIED Claim Is Preempted By NRS 613.330 *et. seq*............29

        4.      The District Court Did Not Deny Leave To Amend......................31

B.      The District Court Correctly Determined Hale's Retaliation Claim
        Failed As A Matter of Law ......................................................33

        1.      Hale's Retaliation Claim Failed As A Matter of Law Because
                She Did Not Experience An Adverse Employment Action..........33

        2.      Hale's Failure To Demonstrate A Causal Connection Between
                An Alleged Adverse Action And Her Protected Activity Is
                Fatal To Her Retaliation Claim .......................................37

C.      The District Court Correctly Concluded Hale Failed To Demonstrate
        She Was Subject To Actionable Harassment Based On Her Sex And
        Even If She Was, The Cosmopolitan Cannot Be Held Liable...............38

CONCLUSION .....................................................................................46

STATEMENT OF RELATED CASES ...........................................................47

CERTIFICATE OF COMPLIANCE ..............................................................48

CERTIFICATE OF SERVICE ....................................................................49

FP 47779876.3

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alam v. Reno Hilton Corp.*,
819 F. Supp. 905, 911 (D. Nev. 1993)................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).........................................................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................24, 27

*Brinkman v. Harrah's Operating Co., Inc.*,
2:08-cv-00817-RCJ-PAL (D. Nev. 2008) ..........................................29

*Brooks v. City of San Mateo*,
229 F.3d 917 (9th Cir. 2000) ...........................................................40

*Brooks v. Hilton Casinos, Inc.*,
959 F.2d 757 (9th Cir. 1992) ........................................................28, 29

*Burlington Industries, Inc. v. Ellerth*,
524 U.S. 745 (1993).....................................................................34, 43

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................25, 26

*Clark County Sch. Dist. v. Breeden*,
532 U.S. 268 (U.S. 2001)...............................................................37

*Cohen v. Fred Meyer, Inc.*,
686 F.2d 793 (9th Cir. 1982) ..........................................................37

*Colquhoun v. BHC Montevista Hosp., Inc.*,
2010 U.S. Dist. LEXIS 57066 (D. Nev. June 9, 2010) .....................30

*Cornwell v. Electra Cent. Credit Union*,
439 F.3d 1018 (9th Cir. 2006) ........................................................37

*Craig v. M & O Agencies, Inc.*,
496 F.3d 1047 (9th Cir. 2007) ..........................................................2

iv

*Davis v. Team Elec. Co.*,
   520 F.3d 108 (9th Cir. 2008) ............................................................33

*Dougherty v. City of Covina*,
   654 F.3d 892 (9th Cir. 2011) ............................................................24

*Enlow v. Salem-Keizer Yellow Cab Co.*,
   389 F.3d 802 (9th Cir. 2004) ............................................................26

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) ..........................................................................38

*Folkerson v. Circus Circus Enters., Inc.*,
   107 F.3d 754 (9th Cir. 1997) ............................................................44

*Harris v. Forklift Sys. Inc.*,
   510 U.S. 17 (1993) .......................................................................2, 39

*Jackson v. Bank of Hawaii*,
   902 F.2d 1385 (9th Cir. 1990) .....................................................31, 32

*Jackson v. Universal Health Servs.*,
   No. 2:13-cv-01666-GMN-NJK, 2014 U.S. Dist. LEXIS 129490
   (D. Nev. Sept. 15, 2014) ...................................................................30

*Jordan v. Clark*,
   847 F.2d 1368 (9th Cir. 1988) ..........................................................39

*Kennedy v. Allied Mut. Ins. Co.*,
   952 F.2d 262 (9th Cir.1991) .............................................................41

*Kortan v. Cal Youth Auth*,
   217 F.3d 1104 (9th Cir. 2000) ..........................................................40

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) .....................................................................25, 26

*Maduike v. Agency Rent-A-Car*,
   114 Nev. 1, 953 P.2d 24 (1998) ........................................................28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..........................................................................26

v

*Meritor Savings Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ...................................................................... 39

*Miller v. Rykoff-Sexton, Inc.*,
    845 F.2d 209 (9th Cir. 1988) ...................................................... 32

*Nelson v. Nelson*,
    99 Nev. 548, 665 P.2d 1141 (1983) ............................................ 28

*Panelli v. First Am. Title Ins. Co.*,
    704 F. Supp. 2d 1016 (9th Cir. 2010) ......................................... 40

*Papasan v. Allain*,
    478 U.S. 265 (1986) .................................................................... 24

*Passantino v. Johnson & Johnson Consumer Prods., Inc.*,
    212 F.3d 493 (9th Cir. 2000) ...................................................... 33

*Raad v. Fairbanks N. Star Borough Sch. Dist.*,
    323 F.3d 1185 (9th Cir. 2003) .................................................... 37

*Richardson v. HRHH Gaming Senior Mezz, LLC*,
    2:13-cv-1913-GMN-CWH, 2016 U.S. Dist. LEXIS 84439, *13 (D.
    Nev. June 28, 2016) ................................................................... 30

*Sands Regent v. Valgardson*,
    105 Nev. 436 (1989) ................................................................... 30

*SEC v. Seaboard Corp.*,
    677 F.2d1301 (9th Cir. 1982) ..................................................... 25

*Shelstad v. TGS Aviation Servs.*,
    No. 2:16-cv-02671-KJD-CWH, 2017 U.S. Dist. LEXIS 103732
    (D. Nev. July 5, 2017) ................................................................ 30

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) .................................................... 25

*Sofamor Danek Group, Inc. v. Brown*,
    124 F.3d 1179 (9th Cir. 1997) ............................................... 21, 27

*Star v. Rabello*,
    97 Nev. 124, 625 P.3d 90 (1981) ................................................ 27

FP 47779876.3

*Swenson v.* Potter, 271 F.3d 1184, 1198 (9th Cir. 2001)........................................44

*Taylor v. List,*
 880 F.2d 1040 (9th Cir. 1989) ...............................................................26

*United States v. Kama,*
 394 F.3d 1236 (9th Cir. 2005) ........................................................22, 27

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar,*
 133 S. Ct. 2517 (2013)......................................................................33, 37

*Van Asdale v. Int'l Game Tech.,*
 577 F.3d 989 (9th Cir. 2009) .................................................................41

*Vasquez v. Cnty of Los Angeles,*
 349 F.3d 634 (9th Cir. 2004) .........................................................26, 34

*Vasquez v. County of L.A.,*
 307 F.3d 884 (9th Cir. 2002) ................................................................34

*Vendermeer v. Douglas County,*
 15 F. Supp. 2d 970 (D. Nev. 1998).......................................................26

Westbrook v. DTG Operations, Inc., No. 2:05-cv-00789-KJD-PAL,
 2007 U.S.Dist. LEXIS 14653, at *19 (D. Nev. Feb. 28, 2007).........................31

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).............................32

**Statutes**

28 U.S.C. § 1291 ...........................................................................................3

NRS 613.310 *et seq*....................................................................................30

**Other Authorities**

29 C.F.R. § 825.305(a)................................................................................36

29 C.F.R. § 825.308(b)(c)...........................................................................35

29 C.F.R. § 825.308(c)(2)............................................................................36

F.R.A.P. 4(a)(l)(A)........................................................................................3

vii

Fed. R. Civ. P. 8(a)(2) ........................................................................24

Fed. R. Civ. P. 15(a) ...........................................................................31

Fed.R.Civ.P 15(a)(1) ...........................................................................24

Fed.R.Civ.P. 15(a)(1)(B) .....................................................................31

Fed.R.Civ.P 15(a)(2) ...........................................................................25

Fed. R. Civ. P. 56(c) ...........................................................................25

Local Rule 15-1 ...................................................................................25

**Miscellaneous**

C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure:*
    *Civil 2d* § 1487 (1990) ...............................................................32

# **INTRODUCTION**

This is a case involving a current employee who had two brief, isolated interactions with a casino guest. The guest, Richard Sherman ("Sherman"), is also a Defendant/Appellee in this action. Sherman became angry when he was not permitted to bet above table limits. He used profanity toward employees, including Plaintiff/Appellant Tonya Hale ("Hale") and was ultimately asked to leave the premises.

To be clear, The Cosmopolitan does not tolerate nor condone the use of profanity toward any of its employees. While these brief verbal interactions with Sherman were unpleasant, they do not amount to actionable conduct which would result in liability for The Cosmopolitan.

Hale's Complaint originally included six causes of action for: (1) sex/gender discrimination; (2) hostile work environment; (3) retaliation; (4) negligent hiring, supervision and retention, (5) verbal assault; and (6) intentional infliction of emotional distress. On appeal, she only challenges the District Court's dismissal of her IIED, hostile work environment, and retaliation claims.

The District Court properly dismissal of Hale's IIED claim because she did not assert facts sufficient to state a plausible claim for relief. She presented no allegation of intentional activity that was extreme and outrageous by The Cosmopolitan and as such, her IIED claim was properly dismissed. She did not avail

1

herself of many options that would have allowed her to amend her Complaint and the Court never denied her that option. As such, the question of whether amendment was improperly denied is not properly before this Court and the District Court's dismissal of her IIED claim should be affirmed.

The District Court also properly determined that Hale's retaliation claim fails as a matter of law. She remains employed in the same position today at a higher rate of pay working games she prefers and cannot demonstrate that she suffered any adverse employment action. Likewise, she cannot demonstrate that any alleged adverse employment action was causally connected to her protected activity, as she cannot demonstrate the individuals engaging in those decisions were aware of her protected activity and were motivated by that awareness rather than compliance with federal regulations. The Cosmopolitan respectfully requests this Court to affirm the District Court's dismissal of Hale's retaliation claim.

Finally, Hale's hostile work environment claim is subject to dismissal because the actions about which she complains were not severe or pervasive. *See Craig v. M & O Agencies, Inc.,* 496 F.3d 1047, 1055 (9th Cir. 2007). Instead, they were brief, isolated, sporadic events. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). Moreover, The Cosmopolitan took appropriate corrective action and Hale has not experienced any further problematic encounters with Sherman. Therefore, The

2

Cosmopolitan once again asks this Court to affirm the ruling of the District Court dismissing Hale's hostile work environment claim.

## JURISDICTIONAL STATEMENT

The District Court exercised subject matter jurisdiction pursuant to 28 U.S.C. §1331, as the Complaint alleged a federal question under 42 U.S.C. 2000e-2. This Court has jurisdiction to review final decisions of the District Court. 28 U.S.C. § 1291. Judgment was entered July 26, 2022, and the Notice of Appeal was filed August 20, 2022, so this appeal is timely. F. R. A. P. 4(a)(l)(A); ER-158-ER-159.

## ISSUES PRESENTED

1.      Whether the District Court properly dismissed Plaintiff/Appellant Hale's claim of intentional infliction of emotional distress against The Cosmopolitan given her Complaint did not contain sufficient facts to demonstrate a plausible claim for relief?

2.      Whether the District Court erred as a matter of law relating to the amendment of Hale's Complaint, even though: (a) the District Court's March 29, 2020 Order does not deny nor prevent Hale from amending her Complaint; (b) Hale never presented a proposed amended complaint for the District Court's consideration as required by Local Rule 15-1; (c) dismissal was not with prejudice; and (d) Hale never sought clarification or reconsideration of the District Court's Order.

3

3.     Whether the District Court properly granted summary judgment dismissing Hale's retaliation claim against The Cosmopolitan.

4.     Whether the District Court properly granted summary judgment dismissing Hale's hostile work environment sexual harassment claim against The Cosmopolitan.

## STATEMENT OF THE CASE

Hale's Complaint contained allegations of sexual harassment, hostile environment sexual harassment retaliation, negligent hiring, supervision and retaliation, and intentional infliction of emotional distress against Appellee, Nevada Property 1, LLC, dba The Cosmopolitan of Las Vegas ("The Cosmopolitan").  On August 28, 2019, The Cosmopolitan moved to dismiss Hale's negligence and intentional infliction of emotional distress ("IIED") claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  ER-162.  On March 30, 2020, the District Court granted The Cosmopolitan's motion to dismiss.  After multiple extensions of time allowing Hale to complete discovery, on April 12, 2021, The Cosmopolitan moved for summary judgment on all of Hale's remaining claims.  ER-165.  On July 26, 2022, the District Court granted The Cosmopolitan's motion for summary judgment.

FP 47779876.3

In this appeal, Hale is only challenging the District Court's dismissal of her (1) IIED; (2) hostile work environment sexual harassment; and (3) retaliation claims.

## A.    **The Parties**

Appellee The Cosmopolitan operates a world class luxury resort and gaming establishment on the Las Vegas strip.  It is committed to providing employees with a workplace free from unlawful harassment and retaliation.  ER-125-ER-130.  It maintains a policy which expressly prohibits harassment and retaliation with multiple avenues of reporting. *Id.* The Cosmopolitan does not tolerate the usage of epithets, slurs, threats, or intimidation or any similar verbal or physical conduct that denigrates or shows hostility or aversion toward an individual based on sex or any other protected characteristic. *Id.*[1]

Appellant Hale has worked for The Cosmopolitan as a table games supervisor for more than ten years.[2]   TCSER-085 at No.5;  TCSER-007  at 41:17-20.  As a table games supervisor, she was responsible for supervising dealers and observing whichever table games she was assigned, making sure gaming procedures were

---

[1] Hale received and was familiar with The Cosmopolitan's policy prohibiting harassment in the workplace. TCSER-024 at 130:1-9.  She attended multiple in-person trainings lasting at least two hours each relating to the policy. *Id.*; TCSER-167-TCSER-169.

[2] Hale briefly resigned to work for another casino, but returned to The Cosmopolitan in September 2013 because she preferred its atmosphere. TCSER-011 at 63:6-12; TCSER-021 at 120:5-15.

followed, and a customer's payouts were accurate. TCSER-008 at 42:2-8. To this

day, Hale continues to work at The Cosmopolitan as a table games supervisor.

TCSER-007 at 41:25-TCSER-046 at 42:2. She has not suffered any loss of benefits

and has received an increase in pay. TCSER-031 at 153:7-14.

## B.     Hale's Interactions With Sherman

### 1.     No Problematic Contacts With Sherman Before January 2018

Hale testified in her deposition she had "maybe three" sporadic interactions

with Sherman prior to January 2018, none of which were problematic. TCSER-045

at 204:9-14; TCSER-046 at 207:18-21. Hale testified Sherman was typically okay

to deal with and got along with female employees. TCSER-013 at 76:11; TCSER-

048 at 208:19-23.

### 2.     The January 10, 2018 Incident

On January 10, 2018, at approximately 1:15 a.m., Hale returned from a break

and went to Table 46 where Sherman was already playing craps. TCSER-047 at

208:24; TCSER-048 at 209:19. When Hale arrived, the Shift Manager, David

Bentley ("Bentley") was at the table speaking with the relief supervisor who was

covering Hale's break. TCER-049 at 210:8-10. There were no significant

problems at the table when Hale arrived, and she had no reason to believe the

interactions prior to her arrival between Sherman and the other employees, including

6

a female dealer, Maria Torres ("Torres") were anything but positive.[3]  TCSER-050 at 211:18-20; TCSER-051 at  212:2-7.

After Hale input Sherman's rating, she saw him handing money to two other players at the table. TCSER-054 at 215:22-25.  Hale heard from another employee that Sherman was being permitted to bet over the table limit or "table max," however, she asked Bentley for clarification.  TCSER-055 at 216:1-2. Bentley reinforced the normal rules and stated Sherman was not allowed to bet over the table max. TCSER-015 at 86:19-20; TCSER-056 at 225:12-18. Hale testified that when she told Sherman he could not bet over the table max he became upset.  TCSER-057 at 226:6-227:9.

Rules vary among games and casinos, so Hale walked over from her normal position behind the table to where Sherman was standing.  TCSER-058 at 227:17-TCSER-059 at 228:7.  She tried to explain to Sherman that since the money played by the other players was coming from him, The Cosmopolitan considered it all one bankroll and the bets were not allowed because together they exceeded the table

---

[3] Sherman was reminded he needed to hit the back wall with the dice while he was playing, but Bentley testified it was not unusual to have to remind players about these type of gaming rules.  TCSER-105  at 78:12-18.

FP 47779876.3

max.[4]  TCSER-060 at 232:13-15.  Hale walked away and returned to her normal position. TCSER-060 at 232:17-19.

Hale testified that after she went back to her normal spot, Sherman started using profanity saying "F*** you, you mother f***er. I'll have your f***ing job . . . I'll call the president tomorrow. . . don't tell me what to do or what I can do because . . .  I've lost a lot of money here . . ."  TCSER-061 at 233:24-234:4.  Hale said she asked Sherman to stop using profanity, but he did not comply.  TCSER-062 at 234:5-8.

Importantly, Sherman never physically touched Hale and for most of their interaction they were on different sides of a large craps table several feet apart with at least one other person, Torres, between them. TCSER-018 at 90:2-25; TCSER-019 at 91:5-11; TCSER-116 at 34:8-14.

Hale testified that Sherman never mentioned her anatomy, gender, or sex. TCSER-020 at 96:6-20.  Hale claimed Sherman told her if she could not handle the job to get someone who could. TCSER-063 at 236:13-16. Hale readily admits Sherman never said her gender had any bearing on her ability to do her job; she just believed he thought she could not handle her job because she was a woman.  TCSER-063 at 236:17-TCSER-064 at 237:8. During her deposition, Hale could not identify

---

[4] Afterward, Bentley also had a conversation with Sherman about table max. TCSER-105 at 78:3-6.

any other comments Sherman made that she felt related to her sex or gender. Torres, the female dealer who was between Hale and Sherman, heard Sherman refer to Hale as a fat bitch, but did not think he was treating anyone differently because of their gender. TCSER-111 at 12:7-13; 12:22-23. Rather, Torres thought Sherman was being belligerent simply because he was not getting his way. TCSER-111 at 12:7-13.

Sherman's displeasure and conduct was not directed solely towards women. Mirko Yazkov ("Yazkov"), a male dealer at the table that evening recalled Sherman being relaxed and calm in the beginning. TCSER-126 at 70:10-13. Yazkov recalled Sherman's conduct escalated and Sherman began using profanity toward everyone, male and female alike. TCSER-123 at 34:3-18; TCSER-124 at 49:9-18. Hale's friend, Frank Acker, the supervisor on the table next to her, also testified he did not see Sherman treat women differently than men. TCSER-134 at 63:19-TCSER-135 at 64:5. Hale speculated Sherman may have been trying to show off. TCSER-013 at 76:12-15. Furthermore, when Hale told Sherman that her boss was right there and invited him to speak with Bentley, she testified he was even dismissive of Bentley responding, "[h]e ain't nobody. He can't tell me what to do . . . I'm talking to the president." TCSER-062 at 234:9-12.

**C.      How Hale Expected The Cosmopolitan To Handle Sherman**

During her deposition, Hale was asked what she expected The Cosmopolitan to do with Sherman on January 10, 2018, specifically whether she expected a customer who used profanity toward her to be removed ("86'd") from the property and never allowed to return.  She responded:

> . . . if we feel threatened or harassed in any form . . . something should be done about it . . . I don't have soft skin. I've been in this business for 20 years, and I understand that we have to deal with things . . .

> No, I don't think [Sherman] should have been 86'd from the property. I think [Sherman] should have been pulled off the game immediately and spoke[n] to by [Bentley] while he's witnessing everything and saying, "Stop it or just leave for the night. You know, you can't talk to our staff this way."

> If I had someone speaking to a dealer in an inappropriate form, it's my job as a supervisor because I'm their boss, like he's mine, to stop it. And I have to stop that and say, "Sir you can't talk to, you know our staff this way. . And so that, in my opinion, [is] no different than what my job is, it was [Bentley's] job to step in and say something to [Sherman]. . .[5]

> [B]ut we should as a company let people know what our guidelines are, and that you can't, you know, talk to people like that. . . . [H]ad I been in [Bentley's] position, I would have asked [Sherman] to step aside from the game. And I would have just said, "You're getting a little out of hand. You know, either calm down or we have to ask you to leave for the night."

---

[5]   Notably, Hale did not do any of these things despite the fact she was Yazkov's supervisor and was present when Sherman was cursing at him.

10

> . . . I don't expect an apology from, you know, from anybody. I just
> expect that [Bentley] should have stepped in and done something ...

TCSER-026 at 136:16-TCSER-029 at 139:21.

## D. Bentley's Response To Sherman's January 10, 2018 Actions

Hale's sworn deposition testimony contradicts her allegation that Bentley did nothing in response to Sherman's actions. Hale conceded during her deposition that her actual knowledge of Bentley's actions and communications was severely limited because she was approximately four feet away from Bentley, Bentley was soft spoken, and Bentley may have said something to Sherman she did not hear. TCSER-016 at 87:6-11; TCSER-062 at 234:15-18. While Hale implies Bentley was present and observing the entire interaction with Sherman, the record establishes otherwise. Whereas Hale was assigned to supervise only one table at a time, Bentley was responsible for all tables on the entire casino floor and on generally supervised approximately 50-70 supervisors and approximately 240-300 employees. TCSER-049 at 210:13-23; TCSER-102 at 75:1-4.

Importantly, Bentley testified he did not allow Sherman to berate or curse at any employees for more than a minute before he took action. TCSER-106 at 80:9-12. Once Bentley was aware that Sherman was directing obscenities at staff and would not stop, Sherman was not allowed to continue playing and he was asked to leave. TCSER-095 at 27:1-5; TCSER-096 at 35:3-TCSER-097 at 36:19; TCSER-098 at 44:5-7; TCSER-102 at 75:14-18; TCSER-104 at 77:11-13. Bentley's

11

Voluntary Statement states, ". . . [w]e also asked Mr. Sherman to not yell obscenities and berate the staff. I asked him to take a break from gaming due to the above reasons . . ." ER-0135.[6]

Other dealers working at the table with Hale also agreed Bentley was responsive and did not fail to address any offensive comments said in his presence. For instance, Yazkov testified although the interaction with Sherman was unpleasant, Yazkov did not remember a single inappropriate comment Sherman made in Bentley's presence to which Bentley did not respond. TCSER-128 at 75:16-TCSER-129 at 76:6. Yazkov further testified that Bentley spoke to Sherman and did what he was supposed to do to try to calm Sherman down. TCSER-125 at 69:18-22. In fact, Yazkov said Bentley had been very proactive in addressing players who got out of control, and that he tried to calm them down and when necessary removed them from the game.[7] TCSER-120 at 26:1-TCSER-122 at 28:25; TCSER-129 at 76:2-6. Likewise, Torres could not identify any conduct Bentley

---

[6] Bentley clarified during his deposition, the phrase "take a break" is commonly used casino jargon meaning the person is not allowed to continue playing. TCSER-099 at 50:4-18. Pit Manager Xiao Deux ("Deux") also testified that Bentley told Sherman to "take a break," and that meant Sherman was done playing for the evening. TCSER-141 at 52:17-TCSER-142 at 53:10.

[7] Yazkov further testified The Cosmopolitan is a good place to work and managers support employees and respond when customers or patrons act inappropriately. TCSER-120 at 26:1-TCSER-122 at 28:23; TCSER-127 at 74:20-TCSER-128 at 75:14.

FP 47779876.3

witnessed but failed to address. TCSER-112 at 17:18; TCSER-114 at 19:6. Hale conceded during her deposition that Bentley did ask Sherman to leave and involved Security. TCSER-017 at 89:3-5.

Hale's admittedly faltering memory cannot supersede uncontroverted evidence in the record. Hale's continued description of the problematic interaction with Sherman as lasting 20 minutes is belied by her own deposition testimony. She admitted she was confused, really did not know how long the interaction lasted, and it "probably seems so much more in [her] mind." TCSER-127 at 74:6-10. In actuality, the time stamped video surveillance shows that the entire interaction from the time Hale arrived at the table to the time Sherman left, including the time before any problematic conduct began, lasted approximately twelve minutes. TCSER-160 at 48:24.

## E. The Cosmopolitan Security Also Responded

As Bentley was walking toward Security, Sherman reached onto the table, grabbed his chips, and walked toward the cage cashier which was located several feet behind Hale. TCSER-019 at 91:2-TCSER-120 at 92:7. Sherman did not say anything further to Hale. *Id.*

One of The Cosmopolitan's security officers, Martinique Anderson ("Anderson"), was stationed at the Security Podium behind Pit 4 where Sherman had been playing. Bentley informed Anderson Sherman needed to leave. TCSER-164-

TCSER-166.[8]   Security Manager, Daniel Landeros ("Landeros"), approached Sherman and told him he was going to be trespassed from The Cosmopolitan. ER-133-ER-137.   Sherman said he understood and "things got out of hand but don't worry [because he] won't be back." *Id.*

The Cosmopolitan's Vice President of Security, Surveillance & Night Club Compliance, David Logue was also notified about the January 10 incident with Sherman and the decision to trespass him from the property.  TCSER-147 at 16:23-TCSER-148 at 17:5.  Logue had approximately twenty-nine years of experience working in law enforcement and received special training on how to handle critical incidents, assessment, and evaluation of risk. TCSER-158 at 42:12-TCSER-159 at 43:3. Prior to any further decisions being made regarding Sherman, Logue reviewed the surveillance report, voluntary statements, surveillance footage, and personally met with Sherman on or about January 11. TCSER-150 at 25:13-22. Logue explained to Sherman The Cosmopolitan's expectations regarding his behavior and told him that he was not allowed to berate or touch employees.  TCSER-157 at 33:11-17; TCSER-161 at 51:7-10.  Sherman was very apologetic and contrite. TCSER-149 at 18:4-7. Sherman did not believe he pushed Bentley but admitted

---

[8] Anderson witnessed Sherman push Bentley as he walked by.  TCSER-164-TCSER-166*.* Because Sherman made physical contact, Anderson asked Bentley if he wanted to press charges.  *Id.* Bentley knew Sherman was upset but did not believe the contact was intentional and did not wish to escalate the matter.  *Id.*

things did get out of hand. TCSER-150 at 25:13-22. He said he was sorry for the arguments he had with employees and assured Logue there would be no further problems. *Id.* Sherman's apology seemed genuine and based on his communication with Sherman, Logue decided to rescind the trespass. TCSER-148 at 17:17-18; TCSER-158 at 42:4-8.

## F. Hale Did Not Complain About Gender Based Conduct Until Several Days After Sherman Had Already Left The Casino

During the January 10 incident, Hale's immediate supervisors were the Pit Manager, Xiao Deux ("Deux") and Shift Manager Bentley. There is no evidence that Hale told either Deux or Bentley, her supervisors on the casino floor that evening, that she felt Sherman's behavior was related to her sex or gender. Hale did not reach out to human resources either. TCSER-023 at 129:23-25. Instead, the first time The Cosmopolitan was informed Hale believed Sherman's conduct was related to her gender was through correspondence sent by Hale's legal counsel. ER-120-ER-122**.** However, this correspondence was sent six days *after* Sherman had already left the casino. *Id.*

## G. Hale's Brief Encounter With Sherman On February 6, 2018

Approximately a month later, on February 6, 2018, Hale had another very brief encounter with Sherman. TCSER-066 at 241:13–TCSER-071 at 247:11. The interaction lasted three to four minutes. *Id.* Hale was already supervising play at one table and Sherman went to another table approximately four feet away. TCSER-

15

065 at 241:18-24. According to Hale, Sherman said, "Tonya, why do you have something against me? What have I done to you?" and kept calling out her name, "Tonya, you know, I don't understand. What have you got against me? Tonya don't like me." TCSER-065 at 242:22–TCSER-067 at 243:2. Hale said she just ignored him.[9] TCSER-067 at 244:3-6. Sherman did not use profanity or say anything else to Hale.[10] TCSER-071 at 247:3-7. He did not physically touch her or reference her gender in any way, shape, or form. TCSER-022 at 128:15-23. Sherman left of his own accord and Hale has had no further interactions with Sherman since February 2018. TCSER-071 at 247:8-11.

## H. Hale's February 7, 2018 Email To Kellie Gorman

The next morning, February 7, 2018, at 4:24 a.m., Hale sent an email to the Director of Table Games Operations, Kellie Gorman ("Gorman"). ER-120–ER-122. In her email, Hale described her interaction with Sherman on January 10, said he was in again, and contrary to her sworn testimony above, Hale claimed she had

---

[9] Hale also said Sherman gave money to a stranger who was playing at her table, but that did not bother her as no one was going over the table max. TCSER-068 at 244:23–TCSER-068 at 244:22. Hale also remembers Sherman doing pushups in the aisle, but stated his conduct did not distress her. TCSER-070 at 246:3-12.

[10] Although paragraph 18 of the Complaint appears to describe conduct that occurred in February 2018, Hale testified during her deposition she did not recall Sherman engaging in the conduct described therein (use of profanity and threating her job) during the February 2018 encounter. TCSER-070 at 270:18-24.

FP 47779876.3

the same issues again with Sherman. *Id.* Hale's email to Gorman was essentially a rehashing of the prior incident with Sherman that was already handled by Security. She also complained about Bentley's leadership incorrectly stating he did nothing to stop Sherman.[11] *Id.*

## I.      Hale's Game Assignments

Hale admits she was not hired to work exclusively in dice. TCSER-007 at 41:15-16. The Cosmopolitan does not have craps personnel. TCSER-174 at 53:8. Table Games employees are required to know multiple games and no one is assigned to a certain game a hundred percent of the time.  TCSER-173 at 51:20-23; TCSER-174 at 53:7-22; TCSER-175 at 55:15-23.

Nevertheless, Hale claims that after her January 10, 2018 incident with Sherman, she was assigned to supervise blackjack, not craps. TCSER-030 at 141:11-12. Hale suspected because Sherman does not usually play blackjack, that Bentley or Gorman made changes to the  assignments so she would no longer be assigned to dice (craps). TCSER-030 at 141:17-19; TCSER-043 at 180:15-21. However, neither Bentley nor Gorman were responsible for determining employees

---

[11]  Hale also referenced an incident with a pencil (the person handling daily schedules) which Hale claims resulted in Hale being removed from dice. ER-120-ER-122.  During her deposition, Hale testified this conflict with the pencil occurred four or more years before her encounter with Sherman.  TCSER-006 at 39:5-19.  She further states that in the five years she had worked with Bentley (well before the Sherman incident), Bentley never really spoke with her.  *Id.*

gaming assignments. TCSER-175 at 55:3-14; TCSER-180 at ¶ 9. Instead, The Cosmopolitan uses an electronic scheduling software system called Schedule Ease to generate employees' game assignments based on employees' skills ratings and The Cosmopolitan's anticipated business needs.

In December 2017, before Hale's first problematic encounter with Sherman, Hale was assigned to craps five times through Schedule Ease and was assigned to craps six additional times due to manual modifications to the Road Map based on employee call outs or other scheduling needs. *See* ER-139. In January, February, and March 2018, she had been assigned to craps 31 times, 15 of those assignments were not generated through Schedule Ease but were instead manual additions to the Road Map. TCSER-180 at ¶ 13. According to the Road Map, The Cosmopolitan did continue to assign Hale to craps games. *Id.*

Regardless, Hale admitted multiple times during her deposition that being scheduled in blackjack is not an adverse situation for her and in fact, she actually prefers it. TCSER-044 at 181:19-24. She further testified as follows:

> Q. Since the Richard Sherman incident, your title hasn't changed
> with the company, correct?
> A. No.
> Q. Your rate of pay hasn't change?
> A. Probably increased.
> Q. Great. Benefits, did you lose benefits?
> A. No.
> Q. Okay. And if you're assigned blackjack versus dice [craps],
> does that affect your rate of compensation?
> A. No.

TCSER-031 at 153:7-17.

## J.    Administration Of Hale's FMLA Usage

Months before her interactions with Sherman, Hale had already requested and been approved to use intermittent leave pursuant to the Family and Medical Leave Act ("FMLA") due to a diagnosed chemical imbalance and depression.  TCSER-032 at 158:14-16; TCSER-183 at ¶ 6. Hale had also previously been approved to take FMLA leave to care for her mother.  TCSER-033 at 167:15-22.

On or about March 6, 2019, Hale requested to take a month off work because she had just found out her mother had an aneurysm. TCSER-034 at 171:9-TCSER-043 at 180:13. As a direct result of the information she relayed, Hale was asked to provide medical documentation to support her request for leave. TCSER-35 at 172:14-19.  Hale thought a doctor was not going to provide the necessary documentation and went to the Senior Vice President of Casino Operations, Brian Benowitz ("Benowitz"). TCSER-035 at 172:19-TCSER-036 at 173:16.  Hale never provided the requested medical documentation but was still allowed to take the full amount of time off that she requested and experienced no adverse repercussions. TCSER-036 at 173:4-24.

Hale also claimed a March 2019 request for her to recertify her FMLA leave was retaliatory. However, Hale admitted no Cosmopolitan employee questioned her about FMLA.  TCSER-074 at 281:7-17.  Rather, on March 19, 2018, Sun Life sent

19

Hale correspondence requesting a recertification for her FMLA leave pursuant to Section 825.308 of the FMLA. *Id.;* ER-153. Sun Life was The Cosmopolitan's third-party administrator for absence and leave management. TCSER-183 at ¶ 3. Sun Life was responsible for tracking the number and dates of employee absences and maintaining FMLA records, including recertification forms. *Id.* at ¶¶ 4, 5.

Importantly, Hale acknowledged a pattern of FMLA call-outs stating, she "was calling in a lot on Fridays because that was her first day back to work after her days off." TCSER-073 at 273:4-8. Specifically, Hale had missed six or more Fridays. *Id.* A list of Hale's absence history supporting the request was in the March 19, 2018 correspondence. *Id.*

Sun Life is not responsible for receipt or handling of complaints The Cosmopolitan employees may have relating to guests, employees, or their workplace. TCSER-184 at ¶ 8. Hale further admitted that she did not tell Sun Life about her encounter with Sherman and had no reason to believe they knew anything about the incident. TCSER-075 at 283:15-23. There is no evidence to suggest any decisions relating to the administration of Hale's FMLA leave or request for recertification had anything to do with the incident with Sherman or her subsequent complaint.

The simple fact of the matter is that Hale experienced two isolated, sporadic, unpleasant interactions with a patron. The Cosmopolitan did not condone Sherman's

behavior. TCSER-094 at 23:3-6; TCSER-161 at 51:7-10; TCSER-172 at 45:2-22. Hale has suffered no adverse action as a result of these interactions. She remains gainfully employed by The Cosmopolitan in the same position, with the same title, benefits, and increased compensation. TCSER-031 at 153:7-14.

## **SUMMARY OF THE ARGUMENT**

### A.    **Hale's IIED was Properly Dismissed**

Hale's argument on appeal effectively waives any possible resuscitation of her IIED claim against The Cosmopolitan. After focusing almost entirely on Sherman's conduct in her argument relating to IIED, she then states "this Court should apply a negligence theory of liability" as it relates to her IIED claim against The Cosmopolitan. *App. Brief* at 24. However, Hale did not assert a claim of negligent infliction of emotional distress ("NIED") against The Cosmopolitan. ER-013-ER-014. This Court does not consider evidence  or arguments raised for the first time on appeal. *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 186, n. 4 (9th Cir. 1997).[12]    Additionally, Hale has not addressed or identified any intentional actions of The Cosmopolitan that could plausibly be considered extreme

---

[12] Hale's reference to articles relating to Gaming Control Board regulations relating to harassment and statistics relating to the occurrence of harassment in the workplace were not raised below and are not properly before the record. Brief at p. 22. In any event, the evidence is clear and overwhelming in this case that The Cosmopolitan does not tolerate harassment and that it did not expect condone or ratify any harassing conduct toward its employees.

FP 47779876.3

and outrageous and instead relies on her faulty assertion that The Cosmopolitan did not do anything in response to Sherman's actions. Issues not specifically and distinctly argued in the brief are deemed waived. *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). Hale's argument the District Court erred in denying her leave to amend is likewise without merit because Hale had numerous opportunities to amend her Complaint and failed to do so. She did not amend her Complaint as a matter of course, did not seek leave to amend with a proposed amended Complaint as required by Local Rule 15-1, and never sought clarification from the District Court about her ability to do so. The District Court's Order does not deny leave. There is no final judgment denying leave to amend or basis for this Court to exercise jurisdiction on that limited issue. Nevertheless, amendment would be futile given the waiver and issues detailed below. Finally, allowing amendment at this late date be unjust and immensely prejudicial to The Cosmopolitan.

## B.     Hale's Retaliation Claim Was Properly Dismissed

Hale's retaliation claim fails as a matter of law because she did not suffer any adverse employment action. She continues to work at The Cosmopolitan to this day, with the same title, no loss of benefits, more pay, and is regularly assigned blackgames which she prefers. Although she claims various decisions relating to the administration of her FMLA were retaliatory, all actions taken were specifically authorized by federal regulations and were based on undisputed information Hale

22

provided like her desire to care for her elderly mother with ailing health, or her admitted pattern of absences. No reasonable person would consider The Cosmopolitan's actions in permitting Hale to take all requested leave as a deterrent for protected activity. Finally, Hale's inability to demonstrate a causal connection between any alleged adverse employment action and her protected activity dooms her retaliation claim. Summary judgment is appropriate when the nonmoving party cannot show that the person(s) making decisions relating to alleged adverse actions knew about her prior protected activity. It is axiomatic that a person cannot make a decision because of information they do not know.

## C.     Hale's Hostile Work Environment Claim Was Properly Dismissed

The District Court properly concluded that Plaintiff's hostile work environment claim fails against The Cosmopolitan because she did not show that she was subject to conduct of a sexual nature or because of her sex. Additionally, the conduct she experienced (an unhappy patron yelling and cursing on a casino floor) was not severe or pervasive enough to alter the terms and conditions of her employment or interfere with her ability to perform her job. Moreover, there is no basis for imputing liability to The Cosmopolitan as it took reasonable measures to prevent and correct harassing conduct in the workplace. It responded to Sherman's conduct removing him from the property when he could not calm down or conform his behavior to their expectations. The Cosmopolitan's actions was effective. When

Sherman returned several weeks later, there were no physical contact with employees or use of profanity and Hale was able to simply ignore him.

## STANDARD OF REVIEW

### A.    Dismissal For Failure To State A Claim

A properly pled complaint must provide a "short and plain statement of the claim showing the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim of relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citations omitted).  A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is reviewed *de novo*.  *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011).

### B.    Leave To Amend

A party may amend its pleading once as a matter of course within 21 days after receiving service of a motion under Rule 12(b).  Fed. R. Civ. P 15(a)(1).  In all other cases, a party may amend its pleading only with opposing party's consent or

leave of the court. Fed. R. Civ. P 15(a)(2). In Nevada, the moving party must attach the proposed amended pleading to a motion seeking leave of the court to file an amended pleading. Local Rule 15-1. The proposed amended pleading must be complete in and of itself without reference to the superseded pleading and must include copies of all exhibits referred to in the proposed amended pleading. *Id.* The denial of a motion for leave to amend is reviewed for abuse of discretion. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004).

## C.    Summary Judgment

Summary is not a "disfavored procedural shortcut," but rather "an integral part of the Federal Rules," which are "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Id.* A moving party is entitled to summary judgment where "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A fact is material if it "affects the outcome of the litigation and requires a trial to resolve the parties' differing version of the truth." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

Disputed factual issues should be construed in favor of the nonmoving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). However, to be entitled to a denial of summary judgment, the nonmoving  party must "set forth specific facts

showing a genuine issue for trial." *Id.* The nonmoving party may not "rest upon the mere allegations or denials of his pleadings." *Vendermeer v. Douglas County,* 15 F. Supp. 2d 970, 974 (D. Nev. 1998). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex,* 477 U.S. at 324*.* If the factual context makes the nomoving party's claim implausible, the party must produce more persuasive evidence than would otherwise be necessary to show there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where there is a complete failure of proof on an essential element in the nonmoving party's case, "all other facts become immaterial, and the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

The entry of summary judgment is reviewed *de novo*. *Vasquez v. Cnty of Los Angeles*, 349 F.3d 634, 639 (9th Cir. 2004). The court may affirm the district court's decision on any ground supported by the record, including grounds the district court did not reach. *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 811 (9th Cir. 2004).

## ARGUMENT

### A. Hale Waived Her IIED Claim Against The Cosmopolitan

#### 1. Negligence Theory Of Liability Raised For First Time On Appeal

Hale did not assert a claim of negligent infliction of emotional distress against The Cosmopolitan. ER-013-ER-014. She alleged IIED. *Id.* However, she argues on appeal that "this court should apply a negligence theory of liability to the harassing conduct of Sherman as it relates to Hales' IIED claim against The Cosmopolitan." *App. Brief* at 29. However, this Court does not recognize issues raised for the first time on appeal. *Sofamor,* 124 F.3d at 1186.

#### 2. Failure To Identify Intentional Conduct By The Cosmopolitan That Would Be Considered Extreme And Outrageous Eviscerates Hale's IIED Claim

Additionally, issues not specifically and distinctly argued in the brief are deemed waived. *Kama*, 394 F.3d at 1230. Hale's IIED claim did not contain enough factual matter that even if taken as true would state a plausible IIED claim for relief against The Cosmopolitan. *Twombly*, 550 U.S. at 570. To establish a claim for IIED, a party must show: (1) defendant's conduct was extreme and outrageous; (2) defendant either intended or recklessly disregarded the causing of emotional distress; (3) plaintiff actually suffered severe or extreme emotional distress; and, (4) defendant's conduct actually or proximately caused the distress. *Star v. Rabello*, 97

Nev. 124, 125, 625 P.3d 90, 92 (1981); *Nelson v. Nelson*, 99 Nev. 548, 555, 665 P.2d 1141, 1145 (1983).

Hale's Complaint contends The Cosmopolitan's alleged failure to do anything about Sherman's actions constitutes extreme and outrageous conduct but that is not sufficient to create a plausible claim for relief. ER-014, ¶ 66.  In Nevada, "extreme and outrageous conduct" has been defined as that which is "outside all bounds of decency and is regarded as utterly intolerable in a civilized society." *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 4, 953 P.2d 24 (1998). Rude, inconsiderate, or unkind behavior, even if it causes a person to feel indignant simply does not qualify. "Liability is only found in extreme cases where the actions of the defendant go beyond all possible bounds of decency, [are] atrocious and utterly intolerable." *v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993); *Brooks v. Hilton Casinos, Inc.*, 959 F.2d 757, 766 (9th Cir. 1992).

Although Hale's Complaint alleged Sherman and The Cosmopolitan acted knowingly, willfully and intentionally, those are mere recitations and labels.  She does not describe any specific allegations showing The Cosmopolitan acted with an intent to cause her harm.  Most of facts and argument contained in her Brief relating to her IIED claim, revolve around Sherman's alleged conduct and Hale fails to identify specific intentional conduct by The Cosmopolitan.  Her Complaint describes

28

Sherman's conduct as despicable but fails to identify any actual conduct by The Cosmopolitan that could be considered extreme or outrageous.

Hale's attempt to repackage her harassment claim is insufficient to give rise to a tort claim based on extreme and outrageous conduct. *See* Brief at 24; *Brooks v. Hilton Casinos, Inc*., 959 F.2d 757, 766 (9th Cir. 1992) (holding that, as a general rule, allegations of discrimination in the workplace do not amount to claims for intentional infliction of emotional distress). There simply is no conduct described in the Complaint that would give rise to the level of extreme or outrageous behavior "outside all bounds of decency" or "utterly intolerable in a civilized society" necessary to state a claim of intentional infliction of emotional distress under well-established Nevada law, and Plaintiff's IIED claim should be dismissed.

### 3. Hale's IIED Claim Is Preempted By NRS 613.330 *et. seq*

N.R.S. § 613.330 *et seq.* provides the exclusive remedy for tort claims premised on illegal employment practices. The Nevada Supreme Court, as well as the District Court for the District of Nevada, have held that "tort claims premised on discrimination in employment are remedied under the statute." *Brinkman v. Harrah's Operating Co., Inc*., 2:08-cv-00817-RCJ-PAL at *3 (D. Nev. 2008). Indeed, the *Brinkman* Court dismissed claims for intentional infliction of emotional distress and negligent supervision because NRS § 613.330 provides the exclusive remedy for claims premised on illegal employment practices. *Id*.

In *Sands Regent v. Valgardson*, 105 Nev. 436 (1989), the Nevada Supreme Court ruled that an employee could not maintain separate tort claims premised upon discriminatory conduct that was subject to the comprehensive statutory remedies provided by NRS 613.310 *et seq.* Specifically, the *Valgardson* Court held that a plaintiff could not maintain a tort claim for wrongful termination in violation of public policy in light of the existence of a comprehensive remedial scheme set forth in Nevada's employment discrimination statutes. *Id*. at 440.

The District Court has also repeatedly rejected tort claims that simply restate discrimination and retaliation claims. *Shelstad v. TGS Aviation Servs*., No. 2:16-cv-02671-KJD-CWH, 2017 U.S. Dist. LEXIS 103732, *9 (D. Nev. July 5, 2017) (dismissing plaintiff's IIED claim "premised on the same allegations that he relies on to support his claims for discrimination and retaliation" as preempted by NRS 613.310); *Richardson v. HRHH Gaming Senior Mezz, LLC*, 2:13-cv-1913-GMN-CWH, 2016 U.S. Dist. LEXIS 84439, *13 (D. Nev. June 28, 2016) ("this Court and the Supreme Court of Nevada have held that Nevada Revised Statutes Section 613.330 provides the exclusive remedy under Nevada law for tort claims premised on illegal employment practices") (internal citations omitted).[13]

---

[13] *Jackson v. Universal Health Servs*., No. 2:13-cv-01666-GMN-NJK, 2014 U.S. Dist. LEXIS 129490 (D. Nev. Sept. 15, 2014) (dismissing negligent hiring, supervision and training claim based on alleged race and gender discrimination when there is an exclusive statutory remedy for these claims); *Colquhoun v. BHC Montevista Hosp., Inc*., 2010 U.S. Dist. LEXIS 57066 (D. Nev. June 9, 2010)

Here, Hale's IIED claim against The Cosmopolitan is premised on its alleged failure to respond to alleged harassment in the workplace for which comprehensive statutory remedies exist under NRS 613.330 *et seq*. Therefore, her IIED claim fails as a matter of law and dismissal was proper.

### 4.    The District Court Did Not Deny Leave To Amend

Although leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), it "is not to be granted automatically." *Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir. 1990).  Hale had 21 days after service of The Cosmopolitan's Motion to Dismiss to file an amended Complaint.  Fed. R. Civ. P. 15(a)(1)(B).  She did not do so.  ER-160-167.  Likewise, Hale did not file a motion seeking leave to amend.  *Id.*  Hale did not present the District Court with any proposed amended complaint for consideration as required by Local Rule 15-1.  The District Court's Order granting The Cosmopolitan's Motion to Dismiss does not deny leave to amend or state that dismissal of the IIED claim was with prejudice. ER-18-ER-24.  Additionally, Hale never  filed a motion seeking   clarification

---

(dismissing negligent hiring, supervision and training claim based on alleged discrimination, stating "the fact that an employee acts wrongfully does not in and of itself give rise to a claim for negligent hiring, training or supervision"); *Westbrook v. DTG Operations, Inc.,* No. 2:05-cv-00789-KJD-PAL, 2007 U.S. Dist. LEXIS 14653, at *19 (D. Nev. Feb. 28, 2007) (dismissing negligence per se claim based on violations of the Americans with Disabilities Act).

relating to her ability to file an amended complaint. Hale's failure to avail herself of multiple avenues to amend her complaint does not equate to reversible error by the Court. Hale mischaracterized the procedural posture, the record below, and her own failure as it relates to amendment. Ultimately, there is no final order relating the issue of amendment before this Court for review. Furthermore, leave to amend may be denied if permitting an amendment would, among other things, cause an undue delay in the litigation or prejudice the opposing party, or if the proposed amendment appears futile or legally insufficient. *Jackson,* 902 F.2d at 1387; *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). Prejudice to the opposing party is the most important factor. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31, 91 S. Ct. 795, 802–03, 28 L. Ed. 2d 77 (1971) (trial court "required" to take potential prejudice into account in deciding Rule 15(a) motion); C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1487 (1990). At this juncture, given the waiver identified above amendment would be futile. Hale's failure to avail herself of opportunities allowing her to amend her Complaint is in stark contrast to the undeniably enormous prejudice The Cosmopolitan would endure if Hale were allowed to amend at this late date, after the completion of discovery and summary judgment proceedings. Accordingly, the Court should deny Hale's request for remand to allow her to amend her IIED claim.

**B.** **The District Court Correctly Determined Hale's Retaliation Claim Failed As A Matter of Law**

To establish a Title VII retaliation claim, Hale was required to show (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the two events using the "but for" standard. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Hale contends that The Cosmopolitan retaliated against her by (1) allegedly improperly administering her FMLA usage by requiring her to submit recertification documents after admitted patterns were observed, seeking FMLA documents when she asked for leave to visit her ailing mother, and issuing a write up relating to FMLA absence; and (2) allegedly removing her from craps games. These are not adverse actions and even if they were, Hale cannot establish that but for her protected activity they would not have occurred.

**1.** **Hale's Retaliation Claim Failed As A Matter of Law Because She Did Not Experience An Adverse Employment Action**

The District Court correctly concluded that the absence of any adverse employment action against Hale was fatal to her retaliation claim. ER-030. An adverse employment action "materially affects the compensation, terms, conditions, and privileges of employment." *Davis v. Team Elec. Co.,* 520 F.3d 108, 1089 (9th

Cir. 2008). Hale admitted there had been no loss in her salary or benefits and that her pay probably increased. TCSER 37 at 153:7-17.

Even if Hale's allegation that she was removed from craps games were true (it is not),[14] rotating her game assignments does not constitute an adverse employment action. "Not everything that makes an employee unhappy is an actionable adverse action." *Vasquez v. County of L.A.*, 307 F.3d 884, 891 (9th Cir. 2002). In *Vasquez*, the Court found that a lateral transfer involving no decrease in pay, hours, or change in location, authority, or responsibility could not constitute an adverse action even when the employee preferred his prior assignment. *Id.* In this case, it is even less likely that a rotation or change in Hale's game assignment could constitute an adverse action especially since there was no change in title, position, benefits or economic harm, and Hale testified she actually prefers supervising blackjack games and finds it easier than craps. TCSER-044 at 181:19-24.

Even when viewing the facts in light most favorable to Hale, the Court properly found that a mere change in employment duties does not constitute an adverse employment action. ER-030 citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 745, 763-2 (1993) (a "bruised ego" is not enough, demotion without change in pay, benefits duties, or prestige insufficient reassignment, to more inconvenient

---

[14] Hale was assigned to craps at least 30 times between January 1, 2018 and March 31, 2018, *see* TCSER-180 at ¶ 13; ER-0139-ER-149.

job insufficient). Hale provided no evidence she was specifically hired to work craps and that reassignment or reduced assignments to craps was a demotion or adverse action.[15] The argument on appeal that a change in her expected assignment could dissuade a reasonable person from reporting is defeated by Hale's deposition testimony that she actually "prefer[red]" to be assigned to blackjack tables over craps. TCSER- 044 at 181:1-24.

Likewise, Hale failed to demonstrate that any actions relating to her "FMLA" usage or the administration of the same could be considered adverse employment actions. Employers are entitled to request that employees recertify FMLA every six months or when there is a significant change in circumstance even if the employee's prior medical certification indicates the employee will need intermittent leave in excess of six months. 29 C.F.R. § 825.308(b)(c). Hale testified she was asked to recertify because she was calling in a lot of Fridays, her first day back to work after her normally scheduled days off. TCSER-073 at 273:4-7. Employers are permitted to seek recertification "if an employee has a pattern of using unscheduled FMLA

---

[15] Hale was a table games supervisor and was not hired for one specific game. TCSER-007 at 41:15-16; TCSER-174 at 53:8. All employees in the Table Games department were required to know multiple games and no one is assigned to a certain game a hundred percent of the time. TCSER-173 at 51:20-23; TCSER-174 at 53:7-22; TCSER-175 at 55:15-23; TCSER-180 at ¶ 11.

leave [particularly] . . .in conjunction with his or her scheduled days off . . ." 29 C.F.R. § 825.308(c)(2).

Additionally, The Cosmopolitan attempt to provide FML based on information provided by Hale in accordance with federal regulations does not constitute retaliation. Hale told The Cosmopolitan she wanted to miss work to visit her elderly mother who had suffered an aneurysm. TCSER-034 at 171:9-14. The Cosmopolitan did as the law requires under those circumstances and offered FMLA leave so she could care for her family member with a serious health condition. 29 C.F.R. § 825.305(a). Moreover, Hale admitted that when she informed The Cosmopolitan she did not want to use FMLA and instead wanted a personal leave of absence, her request was approved. Ultimately, she was not required to use FMLA and was still allowed to take all leave she requested to be with her mother. TCSER-036 at 173:4-24. Finally, Hale's singular write-up for attendance issues was voided within a day, as soon as her FMLA was confirmed, and she has suffered no consequences to her employment as a result of the rescinded write-up. *See* ER-052. No reasonable person would be dissuaded from engaging in protected activity based on these undisputed facts where Hale suffered no adverse action, received everything she asked for, and was not required to utilize her FML leave when she did not want to do so.

**2. Hale's Failure To Demonstrate A Causal Connection Between An Alleged Adverse Action And Her Protected Activity Is Fatal To Her Retaliation Claim**

Hale must show that a causal connection exists between her protected activity and the alleged adverse employment actions using the "but for" standard of causation. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). Hale did not demonstrate any causal connection, much less that "but for" her protected activity, the alleged adverse actions would not have occurred.

There is no causal connection between protected activity and an adverse action, thus summary judgment was appropriate, if an employee cannot show that the person responsible for the adverse action was aware of the employee's protected activity. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-274 (U.S. 2001) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity"); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197-1198 (9th Cir. 2003) (failure to show decision makers' knowledge of employee's prior protected activity was fatal to employee's retaliation claim); *Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1035 (9th Cir. 2006) (affirming summary judgment on retaliation claim where plaintiff presented no evidence that decision maker knew about protected activity); *see also Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).

37

The Cosmopolitan's third-party administrator, Sun Life, initiated and sent Hale the request for recertification. ER-153-ER-157. The March 19, 2018 correspondence from Sun Life sets forth the authority under which the request was being made and explained that Hale had a pattern of using FMLA for six or more Fridays. *Id.* Hale did not provide any evidence that the reason cited in the request for recertification, *i.e.*, her call out history was incorrect or fabricated. Importantly, Sun Life is a separate company, in a different physical location, and not responsible for receipt or handling of complaints The Cosmopolitan employees may have relating to guests, employees or their workplace. TCSER-184 at ¶ 8. Hale admitted that she never told anyone at Sun Life anything regarding the Sherman incident or her protected activity. TCSER-075 at 283:15-19. Hale presented no evidence suggesting that her protected activity was the "but for" cause for any allegedly adverse employment action, especially those actions relating to the administration of her FMLA leave. Thus, summary judgment was properly granted.

**C.     The District Court Correctly Concluded Hale Failed To Demonstrate She Was Subject To Actionable Harassment Based On Her Sex And Even If She Was, The Cosmopolitan Cannot Be Held Liable**

At the outset, the Court should immediately do away with any notion that The Cosmopolitan can be held liable for Sherman's two brief, isolated, and sporadic verbal interactions with Hale. Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 768, (1998). To state a claim for hostile work

environment due to sexual harassment Hale must prove: she was subjected to unwelcome sexual advances, conduct or comments; the harassment was based on sex; and the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). The uncontroverted facts demonstrated that Hale could not meet this burden as a matter of law.

Whether the work environment is "hostile" or "abusive" depends on a totality of the circumstances including "the frequency of the conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). Simple teasing, offhand, comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.; see also*, *Jordan v. Clark*, 847 F.2d 1368, 1374-75 (9th Cir. 1988).

Sherman's alleged verbal interactions with Hale were far milder than other circumstances where courts have found in favor of employers. This is not even a close question. There are no cases in the Ninth Circuit or its underlying district courts where an employer has been held liable for a customer's use of profanity toward an employee where, like here, the interactions were brief, sporadic, and did not involve any physical contact.

The Ninth Circuit affirmed summary judgment for employers where managers or supervisors have referred to female employees as "bitches" and made sexual comments toward them. *See Panelli v. First Am. Title Ins. Co.*, 704 F. Supp. 2d 1016, 1020 (9th Cir. 2010) (managers growled at female employees and commented "I'd do her," pantomimed sexual intercourse, pressured employee to enter a brothel, discussed her anatomy); *Kortan v. Cal Youth Auth*, 217 F.3d 1104, 1110 (9th Cir. 2000) (finding that harassment was not severe or pervasive when the female plaintiff's supervisor referred to women as "castrating bitches," Madonnas," or "Regina" in front of plaintiff on several occasions and directly called her "Medea"). In this case, the inappropriate verbal comments were not even made by a manager or supervisor like in *Panelli* or *Kortan*. They were made by a patron. "Because only the employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship." *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000). Accordingly, it stands to reason, that minimal interactions with a customer or guest who only visits the casino a few times a year, like Sherman did here, is even less likely to result in actionable harassment.

While Sherman's behavior is concerning and The Cosmopolitan did not condone it, it does not rise to the level of actionable sexual harassment. Even

drawing all reasonable inferences in Hale's favor, none of the comments were connected to unwelcome sexual advances, comments or conduct, and none were based on her sex.

Rather than rely upon her prior sworn deposition testimony, the majority of Hale's argument relies on statements in an affidavit served after The Cosmopolitan filed its motion for summary judgment and months after her sworn deposition testimony setting forth facts that she claims to be disputed. Hale cannot create an issue of fact with an affidavit contradicting prior deposition testimony. *See Van Asdale v. Int'l Game Tech*., 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co*., 952 F.2d 262, 266 (9th Cir.1991)). The sham affidavit rule prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting [her] own prior testimony," which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (internal quotation marks omitted); see also *Van Asdale*, 577 F.3d at 998 (stating that some form of the sham affidavit rule is necessary to maintain the principle that summary judgment is an integral part of the federal rules).

For instance, Hale's contention Sherman that made "gender discriminatory comments to [her] contradicts her prior sworn deposition testimony." *Comp.* ER-37 at ¶ 4. Hale testified during her deposition that Sherman never mentioned her

anatomy, gender, or sex. TCSER-020 at 96:6-20. She further admitted he never made comments she felt were related to her sex or gender. TCSER-063 at 236:17-TCSER-064 at 237:8.

Hale felt Sherman questioned her authority because she was a woman; however, sworn testimony shows he did the same thing to Bentley, a man. TCSER-062 at 234:9-12 (referring to Bentley as a nobody and saying Bentley could not tell him what to do). Yazkov testified Sherman used profanity toward everyone, male and female alike. TCSER-123 at 34:3-18; TCSER-124 at 49:9-18. Acker also testified he did not see Sherman treat women differently than men. TCSER-134 at 63:19-TCSER-136 at 64:5.

And even if Hale later believed Sherman's use of the word "bitch" was related to her gender, there is no genuine dispute as to whether Sherman's use of the word was severe or pervasive enough to create an abusive working environment. In fact, Maria Torres, the female dealer who was physically closer to Sherman and heard him refer to Hale as a bitch, did not think Sherman was treating anyone differently because of their gender, and merely thought he was being belligerent because he was not getting his way. TCSER-111at 12:7-13; 12:22-23, TCSER-115 at 22:2-4.

There were only two allegedly problematic interactions with Sherman neither of which involved physical contact. Both encounters were brief. This is another example where Hale tries to create an issue of fact with statements in her affidavit

42

that the interaction lasted 15 to 20 minutes although her prior sworn testimony was that she really did not know how long it lasted and that "it probably seems so much more in [her] mind." TCSER-012 at 74:6-10. In actuality, the first encounter lasted approximately twelve minutes. TCSER-145 at 45:24.

The incidents were isolated and separated by several weeks apart. The use of profanity only occurred during the first interaction and sworn testimony from several employees at the table that evening confirm that when Bentley heard Sherman directing profanity toward employees, he responded promptly and interceded on behalf of the employees. The second incident on February 6, 2018 only lasted three to four minutes. TCSER-065 at 241:13-TCSER-071 at 247:11-17. Sherman did not use profanity or say anything else to Hale. TCSER-071 at 247:3-7. He did not physically touch her or reference her gender in any way, shape, or form. TCSER-022 at 128:15-23. Sherman left of his own accord and Hale has had no further interactions with Sherman since February 2018. TCSER-071 at 247:8-11. Sherman's conduct did not distress Hale and created no disturbance in her ability to perform her job. She testified she simply ignored him. TCSER-068 at 244:3-6.

Even putting aside the fact that the alleged conduct was not sufficiently severe or pervasive to deem it a hostile work environment, liability cannot be imputed to The Cosmopolitan because it took reasonable precautions to prevent and correct potential harassment. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765

(1998); *Faragher v. City of Boca* Raton, 524 U.S. 775, 807-808 (1998). The District Court properly concluded that The Cosmopolitan did not ratify or acquiesce in any harassment sufficient to impute liability onto it. *See Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). An employer may be liable for a private individual's harassing behavior only if it failed to take "immediate and/or corrective actions when it knew or should have known of the conduct." *Id.*

The Cosmopolitan did take immediate and corrective action and exercised reasonable care to ensure this type of conduct did not continue. The District Court properly concluded that "while Hale objects to the sufficiency of The Cosmopolitan's investigation and its subsequent determination to let Sherman back on property without consulting with her, 'liability cannot be premised on perceived inadequacies in [an investigation.'" *Swenson v.* Potter, 271 F.3d 1184, 1198 (9th Cir. 2001).

Hale conceded during her deposition that her assumptions about Bentley's alleged inaction were flawed. She admitted Bentley was soft spoken and that he may have said something to Sherman she did not hear. TCSER-016 at 87:6-11; TCSER-062 at 234:15-18. Bentley testified he did not allow Sherman to berate or curse at any employees for more than a minute before he took action. TCSER-106 at 80:9-12. Once Bentley was aware that Sherman was directing obscenities at staff and would not stop, Sherman was not allowed to continue playing and he was asked

to leave. TCSER-095 at 27:1-5; TCSER-096 at 35:3-6, 35:21-TCSER-097 at 36:19; TCSER-098 at 44:5-7; TCSER-102 at 75:14-18; TCSER-104 at 77:11-13; ER-131-ER-132.

Other dealers working at the table with Hale also agreed Bentley was responsive and did not fail to address any offensive comments said in his presence. For instance, Yazkov testified he did not remember a single inappropriate comment Sherman made in Bentley's presence to which Bentley did not respond. TCSER-128 at 75:16-TCSER-126:6. Yazkov further testified that Bentley spoke to Sherman and did what he was supposed to do to try to calm Sherman down. TCSER-125 at 69:18-22. In fact, Yazkov said Bentley had been very proactive in addressing players who got out of control, and that he tried to calm them down and when necessary removed them from the game.[16] TCSER-120 at 26:1; TCSER-122 at 28:25; TCSER-129 at 76:2-6. Likewise, Torres could not identify any conduct Bentley witnessed but failed to address. TCSER-112 at 17:18-TCSER-114 at 19:6. The Cosmopolitan's response was appropriate under the circumstances. Bentlay trespassed Sherman and Security walked him off the premises. TCSER-147 at 16:25-TCSER-148 at 17:5. Although the trespass was lifted, that only occurred after

---

[16] Yazkov further testified The Cosmopolitan is a good place to work and managers support employees and respond when customers or patrons act inappropriately. TCSER-120 at 26:1-TCSER-122 at 28:23; TCSER-127 at 74:20-TCSER-128 at 75:14.

45

Sherman had a personal meeting with Logue and assured him that he understood The Cosmopolitan would not tolerate him touching or berating staff. TCSER-157 at 33:11-17; TCSER-161 at 51:7-10.

The Cosmopolitan's response was effective as Hale testified that when Sherman did return several weeks later on February 6, 2018, he did not use any profanity. Hale further testified she has not had any further problematic interactions with Sherman. TCSER-029 at 140:24-TCSER-030 at 141:2. Whether Hale was aware of the actions taken by Bentley and Security or not, it is clear that The Cosmopolitan's actions were effective in addressing the alleged conduct. Therefore, no basis exists for imputing liability to The Cosmopolitan and Hale's sexual harassment, hostile work environment claim should be dismissed.

## **CONCLUSION**

For the foregoing reasons, The Cosmopolitan respectfully requests that this Court affirm the District Court's Orders (1) dismissing Hale's intentional infliction of emotional distress claim; and (2) granting summary judgment in favor of The Cosmopolitan.

Dated this 20th day of July, 2023.

FISHER & PHILLIPS, LLP

/s/ Lisa A. McClane
Lisa A. McClane, Esq.
300 South Fourth Street, Suite 1500
Las Vegas, NV 89101

## STATEMENT OF RELATED CASES

The undersigned counsel of record hereby certifies that there are no known related cases pending before this Court.

Dated this 20th day of July, 2023.

FISHER & PHILLIPS, LLP


_____ /s/ Lisa A. McClane _____
Lisa A. McClane, Esq.
300 South Fourth Street, Suite 1500
Las Vegas, NV  89101

FP 47779876.3

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing appellate brief complies with the type-volume limitations as set forth in Rule 32 of the Federal Rules of Appellate Procedure. The brief has been prepared using Times New Roman, 14 pt. and contains a total of 10,029 words proportionally spaced, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

DATED this 20th day of July, 2023.

FISHER & PHILLIPS LLP


  /s/ Lisa A. McClane
Lisa A. McClane, Esq.
300 South Fourth Street, Suite 1500
Las Vegas, NV  89101
*Attorney for Appellees*

FP 47779876.3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that pursuant to Circuit Rule 25-5(f) a true and correct copy

of the foregoing **APPELLEES' OPENING BRIEF** was electronically served via

the Appellate ECF system to the following:

Michael P. Balaban
*Attorney for Appellant*

Jason K. Hicks
Elliot T. Anderson
*Attorneys for Defendant / Appellee Richard Sherman*

Dated this 20th day of July, 2023.

       /s/ Darhyl Kerr
An Employee of Fisher & Phillips, LLP